**UNITED STATES of America**

v.

**William Adderson JARRETT, Defendant.**

**No. CR.A. 3:02CR11.**

United States District Court, E.D. Virginia, Richmond Division.

Nov. 1, 2002.

---

1. This ruling renders moot all pending motions.

Jeffrey Lee Everhart, Richmond, VA, Counsel for defendant.

Brian Hood, Esq., Richmond, Va, Counsel for the United States.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

RICHARD L. WILLIAMS, Senior District Judge.

This matter is before the Court for reconsideration of the defendant's motion to suppress. The Court held an evidentiary hearing on the motion to suppress on March 13, 2002. After granting the defendant's motion for reconsideration, the Court heard additional evidence on October 3, 2002. Having considered all the evidence, exhibits, and arguments, pursuant to Rule 12 of the Federal Rules of Criminal Procedure, the Court makes the following findings of fact and conclusions of law.

### I. FINDINGS OF FACT

1. On July 16, 2000, Captain Kevin Murphy[1] ("Murphy") of the Montgomery, Alabama Police Department received an unsolicited email from the address "*unknownuser1069@hot-*

---

1. At some time after July 2000, Kevin Murphy became a Major with the Montgomery Police Department. Therefore, at some points in the email printouts and testimony, he is referred to as Major Murphy. For simplicity, the Court refers to him simply as "Murphy," regardless of the time period discussed.

*mail.com.* [2] Prior to receiving this email, the government was unaware of Unknownuser's existence.

2. Sandra Herrington was Murphy's secretary in July 2000 and other times relevant to this matter. Her email address is *sherrington@it.montgomery.al.us.* Murphy's email address is *kmurphy@it.montgomery.al.us.* When an email was sent to the police department from the department's website, the mail was routed to the secretary of the division. Therefore, when an email was sent to Murphy through the Montgomery Police Department website, it was received by Sandra Herrington. Murphy accessed his email through Ms. Herrington, and her name and email address appear as the address on several of the email exchanges relevant to this matter. Although Ms. Herrington's name and email address appear on the email messages, the messages were directed to, read, and responded to by Murphy.

3. The subject line of the email received by Murphy from Unknownuser on July 16, 2000, is "this is urgent." The email includes an attachment, and the substance of the message reads:

I found a child molester on the net. I'm not sure if he is abusing his own child or a child he kidnapped. He is from Montgomery, Alabama. As you see he is torturing the kid. She is 5–6 y.o. His face is seen clearly on some of the pictures. I know his name, internet account, home address and I can see when he is online. What should I do? Can I send all the pics and info I have to these emails?

Regards

P.S. He is a doctor or paramedic. [3]

(Att.1, p. 1.) [4]

4. Upon receiving the first email from Unknownuser on July 16, 2000, or shortly thereafter, Murphy contacted the FBI. (Tr. at 19.) [5] Murphy's contact with the FBI was through Special Agent Margaret Faulkner. Agent Faulkner is based in Mobile, Alabama. Murphy and the Montgomery Police Department had a standing working relationship with Agent Faulkner on internet child pornography cases. (Tr. at 16.)

5. On July 17, 2000, Murphy responded to the email from Unknownuser, asking Unknownuser to call Murphy in his office to discuss the matter. (Att.1, p. 2.)

---

2. The identity of *"unknownuser1069@hotmail.com"* remains unknown to the government and the defendant. Therefore, the parties refer to the account holder as "Unknownuser" and the Court does the same here.

3. The Court quotes portions of email messages throughout the Findings of Fact. The Court quotes the messages exactly as they are written, without correcting spelling or other errors.

4. Copies of the recorded email messages exchanged between the government and Unknownuser are attached to the defendant's motion to suppress and the government's response. The government divided the emails into "Attachment 1" and "Attachment 2" and numbered the pages of each. Therefore, the Court cites to the emails as they are numbered in the government's attachments.

5. The Court has a copy of the transcript from the evidentiary hearing held on March 13, 2002. Therefore, the Court cites to relevant page of the transcript, and a citation to "Tr." refers to the March 13, 2002, hearing. A transcript of the evidentiary hearing on October 3, 2002, has not been prepared. When referring to statements from that hearing, the Court cites to the witness's name and the date of that hearing.

6. Also on July 17, 2000, Unknownuser replied to Murphy, stating:

I'm from Istanbul, Turkey. I cannot afford an overseas phone call and I cannot speak english fluently. If you want I can send everything by email. Please help the kid.

(Att.1, p. 3.) Murphy replied with the message: "Please feel free to send the information that you have. We will do everything we can." (Att.1, p. 4.)

7. Following Murphy's second response on July 17, 2000, Unknownuser sent a message with the suspect's internet account information, the phone numbers used to access the internet, and the suspect's name, address, and facsimile number. (Att.1, p. 6.) The name of the individual is Bradley J. Steiger ("Steiger").[6]

8. Unknownuser sent Murphy two more messages shortly thereafter, one on July 17 and one on July 18, 2000, expressing a sense of urgency about the matter and requesting a response from Murphy. (Att.1, p. 7–8.)

9. Murphy replied on July 19, 2000, indicating that the investigation was continuing, and requesting more information from Unknownuser, specifically asking, "will you please send the IP address for the suspect?" (Att.1, p. 9.)

10. Also on July 19, 2000, Unknownuser responded with the requested information. (Att.1, p. 9.) Unknownuser sent two additional messages on July 19, 2000, and one on July 20, 2000, with additional information about Steiger, including the internet account and access information Steiger used, as well as checking account and other financial information about Steiger. (Att.1, p. 10–13.)

11. On August 7, 2000, Murphy sent an email to Unknownuser with the subject "we need to reach you right away." The message requested additional information from Unknownuser. The substance of the message reads: "This is concerning the child pornography case you referred to us. Please e-mail me right away so that we may get some information. We have had some results in the investigation." (Att.1, p. 14.)

12. The FBI had obtained a search warrant for Steiger's residence and seized his computer. The reason that Murphy sent the August 7, 2000, email was because the computer was password encrypted and the FBI needed assistance accessing the files on the computer. (Tr. at 57–58.)

13. On August 9, 2000, Unknownuser replied that he was on vacation until August 11 and needed his own computer to gain access to other computers. He closed the message indicating an interest in assisting the government, however, stating, "tell me what you need? maybe I can find a way." (Att.1, p. 14.)

14. Sometime between August 9 and 11, 2000, Murphy sent another message to Unknownuser that read: "Please reestablish contact with us. Sorry for the delay, but we have been working on the case. We need for you to assist us in gaining entry into the suspect's computer. Your assistance will ensure the possibility of a conviction on the suspect." (Att.1, p. 15.)

---

**6.** The Court discusses the investigation of Mr. Steiger in detail because the relationship of the government agents to Unknownuser during that investigation is important to Unknownuser's ultimate revelation of the defendant, Mr. Jarrett.

15. On August 11, 2000, Unknownuser replied, indicating he had returned from vacation and was willing to help, asking Murphy to "tell me what you want." (Att.1, p. 16.)

16. Murphy did not respond to Unknownuser's offer. The FBI gained access to the files on Steiger's computer through the repair center of the corporation that manufactured the computer. The repair center decrypted the password and provided access for law enforcement. (Tr. at 31.) There are no recorded email exchanges between Murphy and Unknownuser between August 11, 2000, and December 3, 2001.

17. Murphy was in contact with the FBI through Agent Faulkner throughout the period of time that he exchanged emails with Unknownuser. According to Murphy, he acted as a "go-between" between Agent Faulkner and Unknownuser, sending his email responses and requests to Unknownuser at the behest of Agent Faulkner. (Tr. at 18–20.) The email exchange that occurred between August 7 and 11, 2001, in which Murphy requested Unknownuser's help gaining access to Steiger's computer, was at the request of Agent Faulkner. (Tr. at 20.)

18. By making multiple requests to Unknownuser for assistance, the government actively engaged Unknownuser in its investigation.

19. When Murphy received the first email from Unknownuser on July 16, 2000, he did not know that Unknownuser had accessed Steiger's computer and the offensive files by illegally hacking into the computer through the internet. (Tr. at 18.) Murphy was advised of this fact by the FBI at some point in the investigation, prior to the August 7, 2000, email in which Murphy sought Unknownuser's help accessing the files on the computer after it had been seized by the FBI. (Tr. at 19.)

20. After August 11, 2000, Murphy had no direct email exchanges with Unknownuser until December 3, 2001, when Unknownuser contacted Murphy with information about the defendant, William Jarrett. (Tr. at 24.)

21. At no point during his email correspondence with Unknownuser did Murphy advise Unknownuser that hacking into computers is a violation of federal and Alabama law. At no point during the correspondence did Murphy ask Unknownuser to stop his illegal hacking or inform him of possible ramifications if he continued the conduct. (Tr. at 23–24.)

22. In September 2000, Agent Faulkner worked with the Baltimore, Maryland office of the FBI in an attempt to determine the identity of Unknownuser. (Tr. at 52.) The Baltimore office prepared a memo that outlined a method by which the identity of Unknownuser might be determined. (Tr. at 52.) The FBI learned that the internet provider used by Unknownuser was located in Turkey. (Tr. at 52.)

23. At some point in the FBI's attempt to determine the identity of Unknownuser early in the Steiger investigation, the FBI obtained a United States phone number for Unknownuser. Agent Faulkner called the phone number and was connected to a voicemail service. Agent Faulkner left two voice messages for Unknownuser, asking him to contact the FBI. Unknownuser did not respond to the voicemail messages at that time, but a later email message in which Unknownuser

commented on Agent Faulkner's accent shows that Unknownuser did in fact receive the voice messages. (Faulkner Test., Oct. 3, 2002.)

24. During the year 2000, FBI Special Agent James Duffy served as a Legal Attache for the FBI in Turkey. In November 2000, he received an official request from Agent Faulkner to investigate and try to identify Unknownuser. (Tr. 26–28.) According to Agent Duffy, it was obvious from the information provided by Agent Faulkner that Unknownuser hacked into Steiger's computer. (Tr. at 28.)

25. Although "hacking" into computers is a violation of American law, it is not an extraditable offense pursuant to a 1980 treaty between the United States and Turkey. Therefore, according to Agent Duffy, that meant that the Turkish National Police would not assist him in investigating the identity of Unknownuser. (Tr. at 28–29.) As a result, the FBI was unable to take the steps necessary to determine Unknownuser's identity as outlined by the Baltimore office's September 2000 memo. (Tr. at 52–53.)

26. In response to Agent Faulkner's official request, instead of engaging the Turkish National Police, Agent Duffy began his investigation by sending an email to Unknownuser. The email was sent at some point in November 2000, prior to November 29, 2000. In that email, with the subject "I need your help," Agent Duffy asked Unknownuser to contact him by telephone at the United States Embassy in Ankara, Turkey. Duffy explained that he is a Legal Attache, the overseas title for an FBI agent, and that he wanted to speak to Unknownuser about the information sent to the Montgomery, Alabama police. Duffy added: "The person you notified the police about has been arrested. Thank you for reporting this crime. We still need your help in tying up a few loose ends." (Att.1, p. 17.)

27. At some point after sending the email message, Agent Duffy, working with Agent Faulkner, composed a list of questions to ask Unknownuser in the event that Agent Duffy was able to talk with Unknownuser. (Tr. at 32.)

28. A few days after sending the email, Duffy received a phone call in response to the message. The caller had a Turkish accent and identified himself as "Unknownuser." (Tr. at 31–32.) Agent Duffy spoke with Unknownuser and asked him the list of questions he had prepared with Agent Faulkner. Unknownuser responded that he would get back to Agent Duffy with the answers. They also discussed the method by which Unknownuser searched Steiger's computer, with Unknownuser explaining that he used a Subseven Trojan Horse virus and describing his activity as "hacking" into the computer. (Tr. at 33–34.)

29. Also during the telephone conversation, Agent Duffy thanked Unknownuser for what he had done, stated that he appreciated what Unknownuser had done, and told Unknownuser that he had possibly saved two young girls. (Tr. at 34.) Agent Duffy asked Unknownuser to reach out to him because Agent Duffy want to speak with and meet with Unknownuser. Agent Duffy claims that he did not provide directions to Unknownuser or encourage him to do additional searches. (Tr. at 34.) The written evidence in Agent Duffy's emails as described herein indicates otherwise, however, and the

Court does not give great weight to this assertion by Agent Duffy.

30. On November 28, 2000, Unknownuser called Agent Duffy's office a second time, but Agent Duffy missed the call. (Tr. at 36; Att. 1, p. 18–20.)

31. Agent Duffy sent another email on November 29, 2000. In this message, titled "Good news," Agent Duffy confirms that the United States authorities do not desire to prosecute Unknownuser and that they would like to interview Unknownuser. Agent Duffy suggests a date to meet at the United States Consulate and asks Unknownuser to "please answer this request." Agent Duffy further states, again, that "[y]ou will not be arrested—that is a promise. You have helped to save at least two lives in the U.S. and [y]ou should be proud of that fact." (Att.1, p. 19.)

32. On November 30, 2000, Unknownuser sent an email reply to Agent Duffy's message. Unknownuser states that he will not reveal his name nor will he meet with Agent Duffy, indicating that he does not want to have an "overseas enemy," referring to Steiger and his lawyer. Unknownuser's email goes on to answer some questions that Agent Duffy had mentioned in their telephone conversation. Unknownuser explains that he had no prior knowledge of Steiger and he writes: "I catched at least 2000 child pornography collectors with my trap. 3 of them including this guy was producing their own. The other two realized whats going on and cut the connection." Unknownuser also explains how he accessed Steiger's and other computers, explaining that he used the "well known trojan horse named subseven" and provided an internet site where it is available. Unknownuser further explained that he "made it

undetectable so av softwares couldnt see it and bind it with a fake program. After this I posted it to [a pre-teen erotica] news group ...." Finally, Unknownuser closes the email stating, "If you have any more questions, just mail me. I tell you again 'I WILL NEVER TELL YOU MY NAME AND NEVER MEET YOU.'" (Att.1, p. 19.)

33. In response to Unknownuser's message of November 30, 2000, Agent Duffy sent an email reply stating the following:

> Thank you for being so honest. Please check your e-mail periodically as I may send you some questions. It will be your option to answer them. If you still have any additional images you captured from his computer that you believe will help this case, you may forward them to me at [the American Embassy]. Again its your option. Thank you for your help in stopping this man and thank you for your honesty. If you want to bring other information forward, I am available.

(Att.1, p. 27.)

34. The Court finds that the final sentence of the email shows that Agent Duffy had at least some expectation that Unknownuser may uncover additional information in the future.

35. The next contact that law enforcement agents had with Unknownuser was an email sent by Agent Duffy on May 1, 2001. In this message, Agent Duffy informs Unknownuser that the trial of Steiger was postponed and that there is still an opportunity for Unknownuser to be a witness. Agent Duffy again assures Unknownuser that he would not be prosecuted for his actions and that Agent Duffy

would still like to interview him if he is willing. Again, Agent Duffy closes the email saying, "No matter what you do, I want to again thank you for your help in this matter." (Att.2, p. 25–26.)

36. Unknownuser responded to the May 1 email on May 11, 2001. Unknownuser indicates that he wants to contact a lawyer in the Untied States before making a decision about whether to either testify or meet with Agent Duffy, it is not clear which. According to Unknownuser, he spoke with a Turkish lawyer and a prosecutor, both of whom advised Unknownuser against revealing himself. (Att.2, p. 25.)

37. Following the May emails, there was no contact between law enforcement and Unknownuser until December 2001.

38. In a December 3, 2001, email, Unknownuser resumed contact with Murphy of the Montgomery Police Department. This email revealed the defendant, William Jarrett, with the following message:

Dear Mr. Murphy

I found another child molester. He is from Richmond, Va. I need an email of an FBI agent dealing with these kinds of crimes. The girl is in serious danger. If you inform them about me, it will be easier for me. They may think that I'm joking or know the guy before. I collected all the evidence and waiting for your reply.

regards

P.S. what happened to Dr. Steiger?

(Att.2, p. 1.)

39. On the same day, Murphy replied:

I have contacted the local FBI field office and spoke to the agent who handled the Steiger case. She will make the necessary calls to the Richmond, Va. field office regarding this matter. I'm awaiting her instructions on contacting you on what further action will be taken.

Regarding Dr. Steiger's sentence, he got 17.5 years imprisonment.

(Att.2, p. 2.)

40. Murphy knew Unknownuser's history and modus operandi in the Steiger matter, and knew it was likely that he discovered Jarrett in the same way.

41. Agent Faulkner was the FBI agent contacted by Murphy on December 3, 2001. Like Murphy, she was familiar with Unknownuser and knew that the method by which he collected information on potential "child molesters" was by illegally hacking into computers through the internet.

42. Also on December 3, 2001, Unknownuser replied, thanking Murphy for his interest. (Att.2, p. 3.)

43. Murphy replied again on December 3, 2001, stating:

The FBI has asked that you send whatever information you have regarding this criminal complaint to my e-mail address.

(Att.2, p. 4.)

44. By requesting that Unknownuser send the information, the FBI indicated its approval of whatever methods Unknownuser had used to obtain the information.

45. Murphy and Unknownuser each sent one more message on December 3, 2001. (Att.2, p. 5–6.)

46. On December 4, 2001, Unknownuser sent a total of thirteen email messages to Murphy, including a ten-part series of emails with a total of 45 attached files containing the "evidence" Unknownuser had collected.

Unknownuser also sent a message asking whether all ten parts had been received, and a message including the defendant's name and some information about how his files are organized on his computer. (Att.2, p. 7–19.)

47. On December 5, 2001, in response to two email inquiries by Unknownuser wanting to know the status of his report, Murphy replied that he received the emails and the attached files sent by Unknownuser, that the FBI should be collecting the evidence from Murphy that day, that the FBI started an investigation, and that they are establishing an email address for Unknownuser to correspond directly with them. (Att.2, p. 20–23.)

48. On December 6, 2001, Murphy emailed Unknownuser to inform him that the FBI is in receipt of the information, that the Agent working on the case is out until the following Monday, and thanking Unknownuser for reporting the matter. (Att.2, p. 24.)

49. Based on the information provided to the government by Unknownuser, on December 13, 2001, a criminal complaint and application for search warrant were filed against Jarrett in this Court. Both were supported by an affidavit of Agent Zachary Lowe, Jr. of the FBI. In the affidavit, Agent Lowe briefly outlined the information he had received from Agent Faulkner about Unknownuser's revelations in the Steiger matter as well as the information Unknownuser had provided about Jarrett. Agent Lowe had been contacted by Agent Faulkner several times between December 3, 2001, after Murphy was contacted by Unk-

nownuser but before he had received any information, and December 11, 2001, when the FBI had viewed the information emailed to Murphy. Included in the affidavit is the statement that, "[a]t no time during the Steiger investigation, did [Unknownuser] receive guidance from law enforcement officers to conduct investigations." (Lowe Aff. p. 5.)

50. A search warrant and an arrest warrant were issued on December 13, 2001. The FBI executed the search warrant and arrested the defendant.[7]

51. The next contact between the FBI and Unknownuser is an email message sent from Agent Duffy to Unknownuser on December 16, 2001. At the time Agent Duffy sent the email, he was unaware that Unknownuser had reported another matter to the authorities. Of his own volition, Agent Duffy sent the December 16, 2001, email stating:

Hello, I am back in the USA now and can not make any attempts to ever meet you in person. I have been home since July. I want you to know that the Doctor you advised us about in Montgomery Alabama was recently convicted and received a 17½ year jail sentence. In the USA, that is a very harsh sentence. Thank you for advising the U.S. authorities. I would only ask that you acknowledge this e-mail so I know you are aware of your helpfulness. Jim Duffy

(Att.2, p. 26.)

52. On December 17, 2001, Unknownuser replied:

Hello again. I know what had happened to Dr. Steiger. I made another

---

7. Court records indicate that the defendant was arrested on December 14, 2001. Agent Lowe's testimony indicates that the search warrant and arrest warrant were executed on the same day they were issued, which would be December 13, 2001. Therefore, the defendant was arrested either on December 13 or 14, 2001.

criminal complaint about a child molester in Richmond, VA. I asked Major Kevin J. Murphy in Montgomery PD to help me. He said "send me all the files. I'll send them to FBI and they will contact you." It's been 10 day and nobody called me. Are you retired or still in FBI? Please help me. I really want to know whats going on.

(Att.2, p. 27.)

53. On December 18, 2001, Unknownuser sent another email to Agent Duffy, complaining that the FBI had not yet contacted him with information about the status of his complaint about Jarrett. Unknownuser indicated that he read about the arrest of Jarrett in the newspaper but wondered why Agent Faulkner had not contacted him, and he asked Agent Duffy to have Agent Faulkner call him. (Att.2, p. 28.)

54. In a December 19, 2001, email, Agent Duffy again thanks Unknownuser for his valuable assistance to United States law enforcement, provides information about the status of Jarrett's investigation and prosecution, and requests that Unknownuser maintain email contact with Agent Faulkner, providing Unknownuser with her personal email address. Agent Duffy closes the message with the following: "Once again I would like to thank you for your assistance in helping my country identify and prosecute child pornographers. You have my address and feel free to contact me if you wish but please contact Margaret (Agent Faulkner) with any

additional information about violations of our laws." (Att.2, p. 29.)

55. The remaining contact between Unknownuser and law enforcement consists of a series of email exchanges between Agent Faulkner and Unknownuser beginning on December 19, 2001, with an email from Agent Faulkner to Unknownuser, and continuing through February 8, 2002, at which point Agent Faulkner was instructed to cease emailing with Unknownuser because of the defendant's case.[8]

56. The contact beginning on December 19, 2001, was the first direct email exchange between Agent Faulkner and Unknownuser. Agent Faulkner had left two voicemail messages for Unknownuser at some point in the Steiger investigation, and she participated in Murphy's email exchanges with Unknownuser by telling Murphy what to write, although not providing the exact words. (Faulkner Test., Oct. 3, 2002.)

57. Although the email exchanges between Agent Faulkner and Unknownuser began after Unknownuser revealed Jarrett and after Jarrett was arrested, the substance of the emails reveals Agent Faulkner's and the government's opinions of Unknownuser throughout the Steiger and Jarrett investigations, as well as the government's perception of Unknownuser's role in law enforcement activity. The emails also cast doubt on the credibility of Agent Faulkner's testimony, particularly her statements that she did not encourage Unknownuser to continue hacking and that she did not go

---

**8.** These messages are recorded and attached to the defendant's "motion to reconsider motion to suppress." The pages were not numbered in the same way that the earlier emails were in the government's "Attachments" to its response to the defendant's motion to suppress. Because there are no clear page numbers to which the Court can cite, in discussing the email messages, the Court cites to the date of the particular message.

into detail if she expressed thanks to Unknownuser. (Tr. at 60–61.)

58. On December 19, 2001, Agent Faulkner sent an email to Unknownuser in response to Unknownuser's request, conveyed to Agent Duffy, for a status report from the FBI regarding the Jarrett investigation. Agent Faulkner used the email address *"FSoutherngrits@aol.com"* to communicate with Unknownuser. Agent Faulkner communicated through her personal email account because she did not have access to email through the FBI that allowed her to contact an outside user. (Faulkner Test., Oct. 3, 2002.)

59. In the December 19 email, Agent Faulkner introduced herself, then began the substance of her message saying, "I want to thank you for your concern and willingness to forward these types of cases to us." Although the message from Agent Faulkner continues, and she tells Unknownuser that she "can not ask you to search out cases such as the ones you have sent to us," she follows this literal statement of the law with:

But if you should happen across such pictures as the ones you have sent to us and wish us to look into the matter, please feel free to send them to us. We may have lots of questions and have to e mail you with the questions. But as long as you are not 'hacking' at our request, we can take the pictures and identify the men and take them to court. We also have no desire to charge you with hacking. You are not a U.S. citizen and are not bound by our laws.

(Dec. 19, 2001.) Knowing that it is impossible to "happen across" photographs like the ones Unknownuser revealed about Steiger and Jarrett without illegally hacking into a person's computer, Agent Faulkner's statement that the FBI will accept the evidence, pursue an investigation, and will not attempt to prosecute Unknownuser, effectively encourages him to continue his behavior. Agent Faulkner concludes the December 19 email by saying, "This is a long e mail but I have long wanted to chat with you and thank you. So THANK YOU. Feel free to contact me at this e mail address until I can get a secure one at the office and then I will forward that address to you." (Dec. 19, 2001.)

60. Between December 19, 2001, and February 6, 2002, Agent Faulkner sent four additional email messages that have been presented to the Court, and Agent Faulkner estimates that she sent two additional email message that are not recorded. (Faulkner Test., Oct. 3, 2002; Faulkner memo, attached to defendant's motion for reconsideration.) In those messages, Agent Faulkner and Unknownuser engage in a "pen-pal" type correspondence. Agent Faulkner writes: "I am always willing to talk with you," (date unknown); she explains the meaning of extradition, instructing Unknownuser:

I don't know if the United States has such an agreement with Turkey. However, the FACT still stands that you are not a citizen of the United States and are not bound by our laws. Our Federal attorneys have expressed NO desire to charge you with any CRIMINAL offense. You have not hacked into any computer at the request of the FBI or other law enfor[ce]ment agency. You have not acted as an agent for the FBI or other law enforcement agency. Therefore, the information you have collected can be used in our criminal trials.

(Jan. 29, 2002.) Agent Faulkner also states: "Whether or not anyone will ever admit it or not, I think they admire you. I do." (Jan. 29, 2002.) "How about that... your first attempt to hack and LOOK what you found. You probably already know that pornography is the fastest growing addiction. Probably for every one you find and investigate they are ten plus out there that we don't know about." (Feb. 6, 2002.)

61. Some of Unknownuser's responses to Agent Faulkner include:

> This is how all the hacking thing started. 2 years ago, I was searching the internet for a software .... I found a lot of free software. Soon I learned that these software could also be used to hack into others' computers. I made a test. In the first day of the test I got Dr. Steiger. I used a software coded by a real hacker. But now... I'll tell you later.

(Feb. 6, 2002.) Unknownuser also writes, "I think I'll have more free time in these two weeks for writing longer letters. I have a lot to tell you about my hacking adventures." (Feb. 8, 2002.)

62. The responses that Unknownuser writes to Agent Faulkner in early 2002 are clear statements that his hacking is an ongoing process, likely to result in more revelations. Although these statements are made after Jarrett's arrest, they help clarify the relationship between the government and Unknownuser. It is significant that even at this point, knowing Unknownuser has revealed two individuals, is continuing to hack, has a clear interest in law enforcement, and is likely to reveal additional discoveries, Agent Faulkner never instructs Unknownuser that he should cease hacking.

63. Even prior to Jarrett's arrest and Unknownuser's emails to Agent Faulkner in early 2002, the government knew of Unknownuser's hacking and knew that he had "catched at least 2000 child pornography collectors" through his hacking. Knowing this, the government knew or should have known that Unknownuser would continue hacking, and that he would report more violators. Instead of discouraging Unknownuser from continuing, the government remained receptive to his information and assured Unknownuser that it was beneficial and would be useful to prosecute offenders.

64. Agent Duffy thanked Unknownuser for the information he provided in every email Agent Duffy sent to him, of which there were at least six. Agent Duffy also repeated to Unknownuser on multiple occasions that Unknownuser had helped to save lives. Agent Duffy also expressed thanks to Unknownuser during the phone conversation they had. Likewise, Agent Faulkner expressed thanks to Unknownuser.

65. Agent Duffy's and Agent Faulkner's messages show that the government appreciated and approved of Unknownuser's activity. Neither Agent Faulkner nor Agent Duffy ever once instructed Unknownuser to cease hacking into computers. Instead, the government requests additional information for the specific purpose of obtaining a conviction and expresses thanks and praise for Unknownuser's good work and help in obtaining a conviction in the Steiger matter.

66. It is clear from the email exchanges that occurred before Unknownuser revealed the defendant, and is confirmed by Agent Faulkner's messages to Unknownuser after Jar-

rett's arrest, that the government viewed Unknownuser as a valuable resource, was pleased with his information, and accepted it willingly. The testimony of the Agents further confirms this finding. In fact, Agent Faulkner admitted as much in her testimony. (Tr. at 63.) Likewise, it is clear from the exchanges that Unknownuser recognized that his services were valued by the United States government.

67. All the messages sent by Unknownuser indicate a clear desire to assist law enforcement in the detection and prosecution of individuals violating the child pornography laws of the United States. Although Unknownuser refuses to reveal himself and to testify as a witness, he makes himself readily available to the government via email, responds to questions promptly, offers to answer additional questions by the government, and offers to help the government access Steiger's computer files once the government seized the computer. Although the government did not ultimately use Unknownuser for additional searches of Steiger's computer, Unknownuser indicated that he was available and willing to help. Additionally, Unknownuser sent several emails expressing a sense of urgency and concern that he had not received information following up on the status of his revelations as promptly as he wanted. Unknownuser's concern for assisting prosecution efforts is further shown by his interest in the sentence received by Steiger. Unknownuser had no personal or business reason for his actions, and the government does not dispute that Unknownuser's sole purpose in performing his illegal investigations and searches into computers of United States citizens was to assist law enforcement efforts.

68. Given Unknownuser's clear interest in aiding law enforcement efforts and in "catching" people with his hacking "trap," by instructing Unknownuser that regardless of his violations of the law, he will not be prosecuted and that the information he provides will be used by law enforcement, the government encourages his behavior to continue.

69. The totality of all the contact between law enforcement and Unknownuser encourages Unknownuser to continue his behavior and to remain in contact with the FBI.

## II. CONCLUSIONS OF LAW

1. "The Fourth Amendment is directed exclusively at state action and evidence secured by private searches, even if illegal, need not be excluded from a criminal trial." *United States v. Kinney*, 953 F.2d 863, 865 (4th Cir. 1992); *See also Burdeau v. McDowell*, 256 U.S. 465, 475, 41 S.Ct. 574, 65 L.Ed. 1048 (1921).

2. However, "[t]he government may not do, through a private individual, that which it is otherwise forbidden to do." *United States v. Feffer*, 831 F.2d 734, 737 (7th Cir.1987). If the totality of the circumstances show that a private actor "must be regarded as an instrument or agent of the government," the private party's search is considered action by the government and the Fourth Amendment applies to the party's actions. *Id.* (citing *Coolidge v. New Hampshire*, 403 U.S. 443, 487, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971)); *Kinney*, 953 F.2d at 865.

3. The defendant has the burden to establish the existence of the agency

relationship by a preponderance of the evidence. *Feffer*, 831 F.2d at 739.

4. Whether a private citizen is considered a government agent when performing a search is determined by common law agency principles and is a factual inquiry based on the particular circumstances of a case. *Id.*; *United States v. Moss*, 1996 WL 389484, *3 (4th Cir.1996) (unpublished).

5. An agency relationship exists where both parties, the private individual and the government, have "manifested their consent to that relationship, either expressly or by necessary implication from their conduct." *Moss* at *3. The question of consent is generally answered by considering two critical factors: first, "whether the government knew of and acquiesced in the intrusive conduct;" and second, "whether the private party's purpose for conducting the search was to assist law enforcement efforts or to further her own ends." *Feffer*, 831 F.3d at 739. The Fourth Circuit has approved this test in two unpublished decisions. *See Moss* at *3; *United States v. Harrison*, 1999 WL 26921, *2 (4th Cir.1999).

6. Here, it is clear from the evidence, and the government concedes, that Unknownuser was acting solely in the interest of law enforcement in conducting his searches. Therefore, the only question here is whether the government "knew of and acquiesced in the intrusive conduct" and thereby manifested its consent to Unknownuser's actions. This is a fact-specific inquiry. Although the Court has not found a case with the exact facts presented here, the Court finds several cases instructive.

7. In *United States v. Kinney*, a locked closet in the defendant's apartment was opened by the defendant's girlfriend without the defendant's permission. 953 F.2d at 864. The girlfriend had taken the defendant's keys from his pocket while he slept, opened the closet, discovered guns, re-locked the closet, and called the police. *Id.* When the police arrived, the officers declined to open the closet immediately. *Id.* Instead, they first sought further information from the girlfriend. *Id.* The girlfriend became frustrated and opened the closet on her own, revealing the guns. *Id.* In support of a motion to suppress the evidence, the defendant argued that the presence of the police in the apartment the second time that the girlfriend opened the closet transformed her actions into a governmental search. *Id.* at 865. The Fourth Circuit held that a private actor must act as an "instrument or agent" of the government for a search to become governmental action, and "more than the mere presence of a police officer is necessary to constitute the government action required to implicate Fourth Amendment concerns." *Id.* Because the girlfriend acted "on her own initiative, without suggestion from the police officers, when she opened the closet door," the presence of the police in the room, without more, was insufficient to transform the search into governmental action. *Id.*

8. In *United States v. Feffer*, an employee turned over company tax return documents to the Internal Revenue Service. 831 F.2d at 735–36. The employee, along with the two defendants in the case, were involved in falsifying documents on behalf of the company. *Id.* The employee began to fear the consequences of her actions,

and after her fears were confirmed by the IRS, she met with IRS agents on several occasions and provided company documents to them. *Id.* The district court found that the agents never specifically requested additional documents, but that they made themselves available, accepted the documents, and never discouraged the conduct. *Id.* at 737. The district court concluded that "after the initial meeting, the IRS knew or should have known that [the employee] would be producing additional documents and that the IRS had acquiesced in this intrusive conduct." *Id.* Although finding that the government had "at least indirectly encouraged" the employee's actions, the district court concluded that the evidence that agents actively encouraged the behavior was not persuasive, and key to the decision to deny the motion to suppress was the finding that the employee's motivation was to further her own ends rather than to assist the government, which precluded her from becoming a government agent. *Id.* The employee was not offered a reward, she was not promised immunity, and the district court found that the employee's searches were purely private and motivated by fear of prosecution for her own fraudulent actions. *Id.* at 739. The Seventh Circuit upheld the district court's findings but cautioned: "we do not condone the agents' conduct [ ]; and we remind the IRS and its agents that attempts to circumvent the warrant requirements of the fourth amendment through the use of a private party will not be tolerated." *Id.* at 740.

9. *United States v. Moss* involved a search by a United Parcel Service employee after a private security officer at an apartment complex received an anonymous tip that a package containing cocaine was expected to be delivered to the apartment complex. 1999 WL 389484 at *1. Government actors were present and knew that a UPS employee intended to "re-pack" the suspect package because it had a broken zipper with contents protruding from its side. *Id.* at *2. In its analysis, the Fourth Circuit applied the two-part test outlined by the Seventh Circuit in *Feffer*. *Moss* at *3. Citing to *United States v. Kinney*, the Fourth Circuit stated that government knowledge of a search, while critical, standing alone is not enough to establish an agency relationship. *Moss* at *3. Likewise, the Court stated that the failure of government actors to prevent a private search, while important, is not, standing alone, enough to constitute governmental action. *Id.* The decision to affirm the district court's denial of a motion to suppress rested on both prongs of the two-part test. *Id.* at *4. The district court found that government actors knew the UPS agent intended to open the package, but that government actors did not supervise the opening, nor did they suggest to the UPS agent that he take any action regarding the package. *Id.* Additionally, the evidence showed that the UPS employee was acting in accordance with company policy and in furtherance of the company's own ends. *Id.*

10. Finally, the analysis of the facts in *United States v. Walther*, 652 F.2d 788 (9th Cir.1981), is particularly relevant to the Court's decision here. In *Walther*, an airline employee opened an overnight case that had been shipped on his airline as a "speed pak." *Id.* at 790. Two years prior to the incident in question, the employee had worked as a paid confidential informant for the Drug Enforcement

Administration. *Id.* Additionally, the employee had opened speed paks in the past and discovered drugs, which he reported to the government. *Id.* The DEA had never paid him for his discoveries of suspicious speed paks, but the government was aware of his behavior and never discouraged it. *Id.* The court found that the employee's actions were taken solely for the purpose of aiding law enforcement and not in furtherance of any business policy of the airline, and the district court concluded that the "particular combination of factors conclusively demonstrates that [the employee] was acting as an agent." *Id.* at 791. Emphasizing that the degree of knowledge on the part of the government in this case distinguished it from others, the Ninth Circuit upheld the district court's decision to suppress the evidence, stating:

We are [ ] satisfied that Rivard opened the package with the requisite mental state of an 'instrument or agent.'

We are also satisfied that Rivard's prior experience with the DEA provides proof of the government's acquiescence in the search. While the DEA had no prior knowledge that this particular search would be conducted and had not directly encouraged Rivard to search this overnight case, it had certainly encouraged Rivard to engage in this type of search. Rivard had been rewarded for providing drug-related information in the past. He had opened Speed Paks before, and did so with no discouragement from the DEA. The DEA thus had knowledge of a particular pattern of search activity dealing with a specific category of cargo, and had acquiesced in such activity.

*Id.* at 793. Finally, the Ninth Circuit concluded:

We emphasize the narrowness of our holding. It is dependent upon the trial court's finding of extensive contact between Rivard and the DEA and its finding on Rivard's motivation for opening the overnight case. The DEA either knew or should have known that Rivard had made it a practice to inspect Speed Paks, and had acquiesced in that practice.... [T]he government cannot knowingly acquiesce in and encourage directly or indirectly a private citizen to engage in activity which it is prohibited from pursuing where that citizen has no motivation other than the expectation of reward for his or her efforts.

*Id.*

11. Another significant aspect of the *Walther* case is that the government noted that Rivard, the employee, had not been in contact with the DEA for approximately two years prior to conducting the search at issue in that case. *Id.* The Ninth Circuit did not find that fact to change the existence of an agency relationship. *Id.* Here, the government emphasizes that there was a several month period during which the government had no contact with Unknownuser. The Court does not find that significant, however, because even during that period, the government maintained a continuing relationship with Unknownuser, as evidenced by the fact that Agent Duffy took the initiative to contact Unknownuser on his own in December 2001, without first receiving a message from Unknownuser.

12. The facts here establish that the government knew of and acquiesced in Unknownuser's behavior, as those standards have been defined.

13. The caselaw holds that many particular factors, such as government

knowledge, government presence during a search, and the government's failure to prevent a search, when standing alone, each fail to establish the requisite agency relationship. Here, however, there are many individual factors in combination which, when viewed in their totality, show that both parties, the government and Unknownuser, expressed their consent to an agency relationship.

14. While Unknownuser appears to have acted on his own, without any suggestion from law enforcement officers, when he performed the first search of Steiger's computer, the same is not true for the search of Jarrett's computer. The government maintained an ongoing relationship with Unknownuser after he first revealed the Steiger matter. Prior to searching Jarrett's computer, Unknownuser had received significant encouragement from law enforcement officers, implicitly if not explicitly, in the form of praise for his revelations, specific requests to further assist the police with the investigation of Steiger, including specific requests for assistance accessing his computer, repeated requests for Unknownuser to serve as a witness, assurances that the information Unknownuser revealed was valuable to law enforcement and had helped save lives, requests to maintain future contact with law enforcement officers, assurances that law enforcement would accept additional information provided by Unknownuser, and assurances that Unknownuser would not be prosecuted. Therefore, there was far more than mere knowledge on the government's part.

15. Additionally, Unknownuser informed the government of the manner in which he conducted his searches, revealed that he had discovered "at least 2000 child pornography collectors," and it was obvious that Unknownuser would continue his illegal hacking. Not only did the government know of and fail to *prevent* the unlawful intrusions by Unknownuser, the government did not even attempt to stop the behavior or instruct Unknownuser to cease his searches. On the contrary, the evidence supports the conclusion that the government encouraged the behavior.

16. In addition to the guidance provided by the caselaw, helpful to the Court's analysis is the definition of the word "acquiesce." The dictionary defines "acquiesce" as "to accept or comply tacitly or passively." *Webster's Ninth New Collegiate Dictionary* 52 (1985).

17. Given all the information the government knew about Unknownuser's activity, the extensive contact between the government and Unknownuser, Unknownuser's pattern of searches for a particular type of information, and Unknownuser's clear desire to aid law enforcement, the government knew or should have known that Unknownuser would continue his searches and, by condoning the searches and making use of the information provided by Unknownuser, the government acquiesced in his behavior.

### III. CONCLUSION

The Court concludes that the defendant has established that the government knew of and acquiesced in the searches conducted by Unknownuser and that Unknownuser's actions were motivated solely by an interest to further law enforcement efforts. Therefore, the Court concludes that the evidenced seized from the defendant's computer by Unknownuser was the result of an unlawful search in violation of the

Fourth Amendment, thus making the affidavit filed in support of the search warrant defective, as well as the search warrant itself and all evidence seized as a result of its execution. The defendant's motion to suppress is granted, and the evidence will be suppressed.

An appropriate Order shall enter.

## ORDER

This matter is before the Court for reconsideration of the defendant's motion to suppress. The Court's Order and ruling of March 13, 2002, are VACATED, and for reasons stated in the accompanying Findings of Fact and Conclusions of Law, the Court GRANTS the defendant's motion to suppress.

The Court deems the defendant's motion to reconsider to include a motion to withdraw the defendant's guilty plea if the motion to suppress is granted. Because the Court grants the defendant's motion to suppress, pursuant to Federal Rule of Criminal Procedure 32(e), the Court GRANTS the defendant's motion to withdraw his guilty plea, finding that the defendant has shown a fair and just reason to do so. The defendant's guilty plea is therefore deemed withdrawn, and the government is DIRECTED to take whatever action it determines is appropriate.

It is so ORDERED.

Let the Clerk send a copy of this Order and the accompanying Findings of Fact and Conclusions of Law to all counsel of record.