COURT OF APPEALS OF VIRGINIA

Present:   Judges Benton, Elder and Senior Judge Hodges
Argued at Richmond, Virginia


WILLIAM ADDERSON JARRETT

                                                        OPINION BY
v.        Record No. 0167-03-2              JUDGE WILLIAM H. HODGES
                                                        MARCH 30, 2004
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF CHESTERFIELD COUNTY
Herbert C. Gill, Jr., Judge

Jeffrey L. Everhart (Rice, Everhart & Baber, on brief), for appellant.

Kathleen B. Martin, Assistant Attorney General (Jerry W. Kilgore,
Attorney General, on brief), for appellee.


The appellant, William Jarrett, appeals his convictions for sodomy, object sexual

penetration, and four counts of aggravated sexual battery.  Appellant argues the trial court erred

in refusing to suppress the evidence discovered on his computer by a hacker, known as

"Unknownuser."  Specifically, appellant contends that because Unknownuser had helped secure

the arrest and conviction of a child pornographer one year earlier, see United States v. Steiger,

318 F.3d 1039 (11th Cir.), cert. denied, 123 S. Ct. 2120 (2003), Unknownuser was, in fact, a

government agent.  We disagree, and determine Unknownuser was not a government agent.[1]  We

affirm the trial court for the reasons that follow.

_____

[1] The federal courts have also addressed this agency issue on the identical facts, based on
Jarrett's violations of federal law.  See United States v. Jarrett, 229 F. Supp. 2d 503 (E.D.Va.
2002) (finding agency relationship existed), rev'd, United States v. Jarrett, 338 F.3d 339 (4th Cir.
2003) (finding Unknownuser did not act as a government agent).

BACKGROUND

Previous E-mail Relationships Between Unknownuser and Police Agents

On July 16, 2000, Major Kevin Murphy of the Montgomery, Alabama Police Department, received an e-mail from an anonymous sender.[2] With a subject line reading "this is urgent," Unknownuser told Murphy "I have found a child molester on the net." Unknownuser included an attachment depicting a man, Steiger, torturing a child; he told Murphy he knew the man's name, internet account, home address, and when the molester was on-line. Unknownuser asked Murphy what he could do.

Murphy contacted the FBI. His police department had a working relationship with Special Agent Margaret Faulkner in the FBI's Mobile office. From then on, Faulkner acted as a "go-between" for Murphy and Unknownuser, telling Murphy what to say and how to respond to Unknownuser. Murphy asked Unknownuser to call him in his office. Unknownuser responded by saying he lived in Istanbul, Turkey, "[could] not speak English fluently," and could not afford an overseas call. Instead, Unknownuser offered to send "everything by e-mail." Murphy urged Unknownuser to "send the information you have. We will do everything we can." Unknownuser e-mailed Steiger's name, address, fax number, internet account information, and the phone numbers Steiger used to access the internet. Neither Murphy nor Faulkner knew, at first, that Unknownuser was illegally hacking into Steiger's computer for his information.

On July 17 and 18, Unknownuser wrote again to Murphy, asking whether Murphy had followed up on the information and asking Murphy to respond. Murphy responded July 19, telling Unknownuser the investigation was continuing and asking Unknownuser to provide him

---

[2] Because the ultimate determination in this case relies heavily upon both the quantity and quality of Unknownuser's contacts with police officials in the Steiger case, we recount many of those communications here.

with Steiger's "IP address." Unknownuser provided that information the same day; he also supplied additional information about Steiger in subsequent July e-mails.

Between July 17 and August 7, 2000, the FBI obtained a search warrant for Steiger's home and seized his computer. However, Steiger's computer was password encrypted and the FBI needed help in accessing his computer files. Faulkner asked Murphy to request Unknownuser's assistance.

Therefore, on August 7, Murphy, in an e-mail with the subject line, "we need to reach you right away," asked Unknownuser to get in touch with him. Unknownuser explained he was on vacation and needed his own computer to fulfill Murphy's request, but that he would be home August 11. In an undated e-mail written between August 9 and 11, Murphy sent another message, "Please reestablish contact with us. Sorry for the delay, but we have been working on the case. We need for you to assist us in gaining entry into the suspect's computer. Your assistance will insure the possibility of a conviction on the suspect." Unknownuser responded August 11, with the subject line, "I am back" and the message, "tell me what you want." Murphy did not respond. The FBI had received the assistance it needed through other means. Murphy had no more e-mail exchanges with Unknownuser from August 11, 2000 until December 2001, when Unknownuser contacted him about appellant.

Faulkner, however, maintained her involvement in the Steiger case. She sought the help of the FBI's Baltimore office to determine Unknownuser's identity. The Baltimore office found a United States phone number for Unknownuser. Faulkner called the number twice and left two voice mail messages, asking Unknownuser to call the FBI in Alabama.[3] The FBI determined that Unknownuser's internet provider was located in Turkey.

_____

[3] While Unknownuser never responded by telephone, he did comment on Faulkner's southern accent in an e-mail he sent her during appellant's case.

In Turkey, Special Agent James Duffy worked as the FBI's legal attaché. In November 2000, Faulkner communicated with Duffy, asking him to help her identify Unknownuser. Faulkner also told Duffy that the United States Attorney had "no interest" in prosecuting Unknownuser should he be persuaded to come to the United States for Steiger's trial. Duffy understood from Faulkner's request that Unknownuser was a computer hacker; he told Faulkner that Turkish police would be of no assistance since the treaty between the countries[4] did not include computer crimes. However, Duffy attempted to help identify Unknownuser on his own by sending an e-mail to him.

Unknownuser called Duffy a few days later. This phone conversation was the only one any of the law enforcement officers ever had with Unknownuser. A man, in Turkish-accented English, identified himself as "Unknownuser" but refused to provide any additional information about himself. Duffy, using questions Faulkner had faxed to him, asked Unknownuser a series of questions about the Steiger matter. He also told Unknownuser that no one was interested in prosecuting him. Unknownuser admitted to Duffy that he had "hacked" into Steiger's computer. Duffy thanked Unknownuser for his assistance with the case, saying that Unknownuser had "possibly saved" two young girls from further abuse.

On November 29, 2000, Duffy asked Unknownuser to meet him, while repeating his thanks for the help rendered to that point. Duffy also repeated Faulkner's assurance that "US authorities do not desire to prosecute you," as well as "[y]ou will not be arrested—that is a promise." Unknownuser responded apologetically, saying he did not want to reveal his identity for safety reasons. He also told Duffy a few things about himself, saying he was a 33-year-old man with a family, and was not "a computer freak." Unknownuser characterized his search for

---

[4] Treaty with Turkey on Extradition and Mutual Assistance in Criminal Matters, Jan. 1, 1981, U.S.-Turkey, 32 UST 3111 (before "computer crimes" envisioned).

child abusers and pornographers as "a hobby," and claimed he had so far "catched at least 2000 child pornography collectors with my trap." Finally, Unknownuser revealed how he hacked into people's computers, describing the computer virus he planted, and pledged to answer "any more questions," though only through e-mail.

In his last communication of 2000, Duffy again wrote Unknownuser in a solicitous fashion, responding to Unknownuser's desire to remain anonymous:

> Thank you for being so honest. Please check your e-mail periodically as I may send you some questions. It will be your option to answer them. If you still have any additional images you captured from his computer that you believe will help this case, you may forward them to me at American Embassy . . . . Again its your option. Thank you for your help in stopping this man and thank you for your honesty. If you want to bring other information forward, I am available.

On May 1, 2001, Duffy e-mailed Unknownuser, again seeking help. Duffy told Unknownuser that the Steiger trial was about to start and that he was returning to the United States with the likelihood of testifying. Duffy asked Unknownuser if he had other information for the FBI and provided several contact numbers. Unknownuser responded through e-mail on May 11, telling Duffy he wanted to speak with an American lawyer before deciding. There was no further contact between Unknownuser and law enforcement officials for almost seven months. After Steiger was convicted and sentenced, Duffy e-mailed Unknownuser, telling him the length of Steiger's sentence, and thanking him profusely for the part he played in the conviction and "harsh" sentence.

E-mails Between Unknownuser and Police Agents Regarding Appellant's Computer Files

On December 3, 2001, Unknownuser wrote Murphy, telling him he had "found another child molester," in Richmond, Virginia and that he had "collected all the evidence and [was] waiting for your reply." Murphy wrote back the same day; he told Unknownuser that he contacted the FBI and spoke with the "same agent" who "handled the Steiger case." Murphy

reported that "she" would forward the matter to the Richmond field office. Nonetheless, later on December 3, Murphy wrote to Unknownuser, stating that "the FBI has asked that you send whatever information regarding this criminal complaint to my e-mail address," and Unknownuser responded by saying he would start sending the information on December 4.

On December 4, 2001, Unknownuser e-mailed "parts 1 to 10." He then sent five additional e-mails asking if Murphy had received all ten parts. In one e-mail, he provided a description of how appellant arranged his computer files and other computer-related information. On December 5 and 6, Murphy told Unknownuser the FBI had received all the information and that the FBI had begun an investigation. On December 13, 2001, FBI Special Agent Zachary Lowe in Richmond obtained a search warrant for appellant's home and seized evidence. Appellant was arrested December 14.

On December 17, 2001, Unknownuser wrote Duffy, asking for Duffy's help in determining the status of appellant's case. Duffy responded, and addressing Unknownuser as "[m]y friend," thanked Unknownuser for his "valuable assistance." Duffy wrote of his intention to retire soon and gave him Faulkner's e-mail address as Unknownuser's "point of contact from now on." He described Faulkner as "the person who the Montgomery Police contact after you send them e-mails." Duffy closed his note by writing, "please contact Margaret [Faulkner] with any additional information about violation of our laws."

Faulkner began writing Unknownuser on December 19, 2001. She thanked him for his "concern and willingness to forward these type cases to us" and wrote she would "be glad to be the contact point for you if you have further questions or concerns about matters such as the ones you recently sent to us via the Montgomery Police Department." Faulkner also wrote:

> I can not [sic] ask you to search out cases such as the ones you
> have sent to us. That would make you an agent of the Federal
> Government and make how you obtain your information illegal
> and we could not use it against the men in the pictures you send.

> But if you should happen across such pictures as the ones you have sent to us and wish us to look into the matter, please feel free to send them to us.

From December 19, 2001 through February 8, 2002, Faulkner and Unknownuser continued what Faulkner described in one of her messages as her "first e mail pen pal" relationship. They exchanged both personal and professional information.[5] On February 6, 2002, Faulkner made the only mention of appellant, telling Unknownuser a suppression hearing was scheduled for a hearing the next month, that she had to testify as to how Unknownuser contacted the police agents, and that "[you] are becoming famous."

Appellant entered a conditional guilty plea to the charges against him, subject to his motions[6] to suppress the computer evidence. The trial court denied the motions and entered a final order on December 31, 2002.

## ANALYSIS

### Standard of Review

Upon appellate review of a trial court's denial of a motion to suppress, the appellant has the burden to show that the ruling, when the evidence is viewed in the light most favorable to the Commonwealth, was reversible error. Murphy v. Commonwealth, 264 Va. 568, 573, 570 S.E.2d 836, 838 (2002). "A defendant's claim that evidence was seized in violation of the Fourth Amendment presents a mixed question of law and fact that we review *de novo* on appeal."

---

[5] The government conceded at oral argument before the Fourth Circuit that because of the e-mail exchanges between Faulkner and Unknownuser (after appellant was arrested), Unknownuser "probably" would have been considered a government agent as to any evidence or information of illegal activity from December 19, 2001 and forward. Jarrett, 338 F.3d at 346.

[6] The trial court agreed to reconsider its denial of appellant's motion to suppress the computer evidence after the United States District Court reversed its initial decision to deny the motion to suppress. (The federal trial judge had not received the December, 2001 through February, 2002 communications between Faulkner and Unknownuser at the first suppression hearing, while the trial judge below had reviewed and considered *all* the e-mail evidence in the first suppression hearing.)

- 7 -

Ornelas v. United States, 517 U.S. 690, 691 (1996). "In making such a determination, we give deference to the factual findings of the trial court and independently determine whether the manner in which the evidence was obtained meets the requirements of the Fourth Amendment." Murphy, 264 Va. at 573, 570 S.E.2d at 838. Here, the trial court accepted the facts as found by the federal trial court.

The Fourth Amendment does not apply to a private citizen's search unless that person "is acting as an agent of the Government or with the participation or knowledge of any government official." United States v. Ellyson, 326 F.3d 522, 527 (4th Cir. 2003) (a private search may be converted into state action only if the private sector is "regarded as having acted as an 'instrument' or agent of the state"); accord Mills v. Commonwealth, 14 Va. App. 459, 463, 418 S.E.2d 718, 720 (1992). Moreover, a wrongful search and seizure conducted by a private party "does not deprive the government of the right to use the evidence that it has acquired lawfully." United States v. Walter, 447 U.S. 649, 656 (1980) (internal citation omitted).

Agency

Appellant bears the burden of establishing that Unknownuser acted as a government agent when he hacked into appellant's computer and obtained evidence of illegal sexual activities with minors. Ellyson, 326 F.3d at 527; Sabo v. Commonwealth, 38 Va. App. 63, 73, 561 S.E.2d 761, 766 (2002). Determining whether a person acted privately or as an agent of the government "is a question of fact that must be decided on the circumstances of each case. Resolution of the agency issue 'necessarily turns on the degree of the Government's participation in the private party's activities.'" Mills, 14 Va. App. at 463, 418 S.E.2d at 720 (quoting Skinner v. Railway Executives Ass'n, 489 U.S. 602, 614-15 (1989)).

"Of critical importance, for an agency relationship between a private citizen and the government to exist, both parties must have manifested their consent to that relationship, either

- 8 -

expressly or by necessary implication from their conduct." Sabo, 38 Va. App. at 74, 561 S.E.2d at 766. "While government knowledge of the private person's conduct obviously is critical, it is not enough, standing alone, to establish the requisite agency." Id. Therefore, it is not enough that Murphy, Duffy and Faulkner knew that Unknownuser was a computer hacker who had an interest in seeing child abusers and pornographers brought to justice. The evidence must also show that the law enforcement officers and Unknownuser "consented" to an agency relationship, as manifested in their conduct, in order to establish agency.

We have adopted a two-part test to help us determine whether a person was acting as an agent of the government while conducting a search. See Sabo, 38 Va. App. at 74, 561 S.E.2d at 766; Mills, 14 Va. App. at 463, 418 S.E.2d at 720. "Under that test, a trial court looks at '(1) whether the government knew of and acquiesced in the search, and (2) whether the search was conducted for the purpose of furthering the private party's ends.'" Sabo, 38 Va. App. at 74-75, 561 S.E.2d at 766 (quoting Mills, 14 Va. App. at 463-64, 418 S.E.2d at 720). However, our inquiry does not stop there; we must also consider "whether the private party acted at the request of government and whether the government offered a reward." Id. at 75, 561 S.E.2d at 767.

Our holding in Sabo offers guidance in analyzing this case. In Sabo, someone purposely cut the brakes of a car belonging to the victim, Lawrence, who had an accident as a result. Lawrence subsequently received numerous anonymous calls. Police conducted an investigation to determine who had tampered with her car. One officer, Coale, gave Lawrence a tape recorder and tapes in order for her to tape any calls. Coale told Lawrence not to call the defendant, an ex-boyfriend, but that if he called "and she wanted to make tapes, that would be useful to [their] investigation." Id. at 70, 561 S.E.2d at 764. Coale thought Lawrence might be able to elicit the defendant's reaction to the description of her car accident if he were to call. Instead, Lawrence called the defendant and taped their conversation and gave the tape to Coale; it did not elicit any

incriminating evidence. <u>Id.</u> Coale advised Lawrence not to contact the defendant any more. <u>Id.</u> However, Lawrence continued phoning and taping the defendant, taping over and reusing tapes of previous conversations.

We found that the facts in <u>Sabo</u> satisfied neither prong of the two-part test. First, we determined that Lawrence did not continue the taping for law-enforcement purposes, but for her own purposes, concluding that Lawrence's actions revealed her desire to determine who was "terrorizing her." <u>Id.</u> at 76, 561 S.E.2d at 767. We further found that

> [t]he record fails to show that Coale exercised influence or authority over Lawrence or that they worked together to achieve some common goal or plan. Lawrence was motivated by her sense of fear and a desire to identify her unknown antagonist. She wanted to end the harassment, and to that end, she ignored Coale's admonitions and independently telephoned appellant and engaged him in conversations, which she recorded. Coale never supervised Lawrence or directed her to do anything. In fact, after hearing some early taped conversations, Coale directed Lawrence not to contact appellant anymore because the conversations failed to implicate appellant or further the investigation. He exercised no control or authority over her and offered no payment or reward. Moreover, Lawrence and Coale did not share a common purpose or plan.

<u>Id.</u>

Here, the Commonwealth concedes that Unknownuser acted solely in the interest of law enforcement, <u>see</u> <u>Jarrett</u>, 338 F.3d at 345; <u>Jarrett</u>, 229 F. Supp. 2d at 516. Therefore, we will not belabor the second part of the two-prong test. However, the first prong, the question of whether Murphy, Duffy or Faulkner exercised influence or authority over Unknownuser, or whether they worked together to achieve what we called in <u>Sabo</u> a "common goal or plan," bears further inquiry. As the Fourth Circuit put it, "the only question before us concerns the first factor — did the Government know of and acquiesce in Unknownuser's search in a manner sufficient to transform Unknownuser into an agent of the Government, and so render the search unconstitutional." <u>Jarrett</u>, 338 F.3d at 345.

Ellyson proves instructive.  In Ellyson, the defendant was convicted of possessing child pornography images.  The conviction resulted from a 1998 police search of his North Carolina trailer on an unrelated matter.  Ellyson, 326 F.3d at 525.  The results of the initial police search were not admitted by the trial judge because police had entered the trailer with neither Ellyson's permission nor a search warrant.  Id. at 526.  However, a tenant, Angela Burr, who also resided in the trailer, had turned over evidence of child pornography to police after visiting Ellyson in prison.  Burr provided the material in the hope of being able to continue living in the trailer;[7] therefore, the material was deemed admissible.  After concluding that the tenant had a "legitimate independent motive" for performing the search, the court reviewed the facts surrounding her relationships with law enforcement:  "[The tenant's] actions were not motivated by a desire to aid the police in building their case, but by a desire to preclude law enforcement from holding her responsible for any items subsequently discovered in the trailer."  Id. at 528 (citation omitted).

Based on Burr's trial testimony as well as the testimony of various police officers, the court concluded that the police never asked Burr to visit Ellyson in jail.  Further, because the police did not know Ellyson had asked the tenant to find and destroy child pornography on computer discs that the police had not seized in their prior, illegal search, the discs that the tenant found and turned over to the police were not the result of the initial search.  "The police had not participated or acquiesced in the [second] search."  Id.  Therefore, the court concluded the tenant was not acting as an agent of the government in locating the evidence.  Summarizing this first requirement of the agency prong, the court concluded that "more than mere knowledge and

_____

[7] The police had made clear to Burr that if they found anything illegal in the house, "[she] would possibly [be charged with] aiding and abet[ting]" so it would be in her best "interest to turn it in or else [she] could be liable for it."  Ellyson, 326 F.3d at 525.

passive acquiescence by the Government [must exist] before finding an agency relationship. See Ellyson, 326 F.3d at 527-28." Jarrett, 338 F.3d at 345.

Agency Considerations Applied in Appellant's Case

Here, the question of whether Murphy, Duffy or Faulkner ever asked Unknownuser to search, seize and turn over to them any evidence of additional child pornographers is more problematical. Appellant argues that Duffy's continuing praise of Unknownuser for discovering Steiger's wrongdoing, and especially Duffy's invitation, "[i]f you wish to bring other information forward, I am available," represents a thinly veiled entreaty that the hacker continue his illegal activities. Appellant also points to Faulkner's lengthy behind-the-scenes engagement with Unknownuser and her "wink and a nod," suggestion, Jarrett, 338 F.3d at 343 (that Unknownuser "feel free to send" any pictures he might "happen across") as acquiescence by the law enforcement officials to Unknownuser's hacking "investigations."

However, the Commonwealth argues that Duffy's statement related back to the Steiger case and represents at most, "a vague offer of availability to receive more information in the future." Jarrett, 338 F.3d at 347. We cannot say the trial court erred in agreeing with the Commonwealth. And, more importantly, Faulkner's December 19th appeal to Unknownuser for him to forward any incriminating evidence he might "happen across," occurred more than two weeks after Unknownuser had "searched" appellant's computer and resulted in no further evidence against appellant. As the trial court stated in response to appellant's argument that the Faulkner-Unknownuser correspondence evidenced their close relationship, their "post-December correspondence make[s] this a much closer case," but their "pre-December 13 correspondence leads this court to conclude" that Unknownuser was not a government agent. We agree.

When Unknownuser wrote Murphy on December 3, 2001, informing him he had "collected all the evidence" on appellant, the search was completed. Neither Murphy, Duffy nor

Faulkner knew of Unknownuser's search of appellant's computer in advance of Murphy's receipt of the search results. As in Ellyson, the police agents were quite incapable of either knowing about or acquiescing in Unknownuser's search of appellant's computer. None knew Unknownuser's identity and could only guess at his domicile. Thus, the first prong of the two-part test, "whether the government knew of and acquiesced in the search," Jarrett, 338 F.3d at 345; Sabo, 38 Va. App. at 74-75, 561 S.E.2d at 766, also fails.

Finally, appellant argues that none of the government agents dissuaded Unknownuser from his illegal hacking. Even so,

> [t]hat the Government did not actively discourage Unknownuser from engaging in illicit hacking does not transform Unknownuser into a Government agent. Although the Government's behavior in this case is discomforting, the Government was under no special obligation to affirmatively discourage Unknownuser from hacking. See Coolidge [v. New Hampshire, 403 U.S. 443,] 488 [(1971)] ("It is no part of the policy underlying the Fourth and Fourteenth Amendments to discourage citizens from aiding to the utmost of their ability in the apprehension of criminals."); United States v. Souza, 223 F.3d 1197, 1202 (10th Cir. 2000) (holding that police are under no duty to discourage citizens from conducting searches of their own volition).

Jarrett, 338 F.3d at 346 (footnote omitted).

For these reasons, we find no error in the trial court's conclusion that Unknownuser was not a government agent. Accordingly, we affirm appellant's convictions.

Affirmed.

Benton, J., dissenting.

For the reasons that follow, I would reverse the convictions and remand for a new trial.

I.

The Fourth Amendment provides that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend IV. This protection proscribes governmental action; however, the principle is well recognized that a private party may "be regarded as having acted as an 'instrument' or agent of the state." Coolidge v. New Hampshire, 403 U.S. 443, 487 (1971).

> Whether a private party should be deemed an agent or instrument of the Government for Fourth Amendment purposes necessarily turns on the degree of the Government's participation in the private party's activities, a question that can only be resolved "in light of all the circumstances." The fact that the Government has not compelled a private party to perform a search does not, by itself, establish that the search is a private one.

Skinner v. Railway Labor Executives' Ass'n, 489 U.S. 602, 614-15 (1989) (citations omitted). We have noted that this standard suggests a two-part analysis: "(1) whether the government knew of and acquiesced in the search, and (2) whether the search was conducted for the purpose of assisting law enforcement efforts or for the purpose of furthering the private party's ends." Mills v. Commonwealth, 14 Va. App. 459, 463-64, 418 S.E.2d 718, 720 (1992). In conducting this analysis, "the ultimate question whether a private person is actually a government agent [is] a question that requires the application of a legal concept (agency) to facts." United States v. Martin, 195 F.3d 961, 963 (7th Cir. 1999). According to the usual standard of review, this legal determination of agency is subject to *de novo* review on appeal. See Ornelas v. United States, 517 U.S. 690, 699 (1996).

- 14 -

II.

The evidence unambiguously established that Unknownuser's motivation for illegally hacking into William Adderson Jarrett's computer was to assist the law enforcement authorities in arresting and prosecuting child molesters. The record indicates that Unknownuser first contacted law enforcement authorities in July 2000 when he sent an e-mail message to the Montgomery, Alabama Police Department stating that he "found a child molester on the net." He then offered to send information he had stolen from Steiger's computer for their use in a prosecution. Throughout his correspondence in the Steiger matter, Unknownuser urged the law enforcement authorities to act promptly, and he consistently requested that the authorities keep him informed. Later, to facilitate his reporting of child molesters, he requested "an e-mail [address] of an FBI agent dealing with these kinds of crimes." Although the trial judge made no specific finding on the issue, I agree with the majority opinion that the F.B.I. "concede[d] . . . that Unknownuser's motivation for conducting the illicit searches stemmed solely from his interest in assisting law enforcement authorities." United States v. Jarrett, 338 F.3d 339, 345 (4th Cir. 2003). Indeed, on brief the Commonwealth does not contest this issue and asserts "it is likely Unknown User's primary purpose was to assist law enforcement officers in prosecuting child pornographers." I would hold that Unknownuser acted for the purpose of assisting law enforcement efforts and, therefore, the evidence established the second part of the Mills analysis.

A significant factor in the first part of the analysis -- "whether the government knew of or acquiesced in the search," Mills, 14 Va. App. at 463, 418 S.E.2d at 720, -- is the determination whether "the Government did more than adopt a passive position toward the underlying private conduct." Skinner, 489 U.S. at 615. Thus, the dispositive issue on appeal is whether the trial judge erred when he ruled that the evidence failed to establish "governmental action" and "that [Unknownuser] was independent of any act of the State or Federal government."

- 15 -

The evidence proved that on December 4, 2001 Unknownuser sent to the F.B.I. e-mails containing materials he illegally obtained by hacking into Jarrett's computer and copying Jarrett's files. The evidence further proved that the F.B.I. had learned as early as July 2000 that Unknownuser had been performing illegal computer activities and that Unknownuser had obtained files by means of unlawful entry into Steiger's computer. After the F.B.I. began receiving e-mail files from Unknownuser in July 2000, the F.B.I. did not inform Unknownuser that his activity was illegal or tell him to stop his activities.[8] Instead, the F.B.I. encouraged him to continue those activities for the benefit of law enforcement prosecution. In November 2000, an F.B.I. agent assured Unknownuser that "US authorities do not desire to prosecute [him]" and would not arrest him. In that same month, an F.B.I. agent sent the following e-mail:

> Thank you for being so honest. Please check your e-mail periodically as I may send you some questions. It will be your option to answer them. If you still have any additional images you captured from [Steiger's] computer that you believe will help this case, you may forward them to me at American Embassy . . . . Again its your option. Thank you for your help in stopping this man and thank you for your honesty. *If you want to bring other information forward, I am available.*

(Emphasis added).

In United States v. Knoll, 16 F.3d 1313 (2nd Cir. 1994), the evidence established that an Assistant U.S. Attorney told a private individual, who had stolen documents from the defendant and delivered them to the government in hopes of getting favorable treatment on his own criminal charges, that he needed to "get . . . more information," that "you've got to turn more

---

[8] Although Unknownuser indicated in an e-mail message that he was "from Turkey," no evidence in the record established that he was a foreign national or that he could not be prosecuted in the United States. Although Unknownuser indicated that he could not afford to telephone because of the prohibitive cost of international telephone calls, the record indicates the F.B.I. learned of a telephone number in the United States registered to Unknownuser. After an F.B.I. agent left a message on the voice mail service connected to that telephone, Unknownuser sent an e-mail indicating he had received the message and commented on the agent's southern accent.

over," and that "if there's stuff out there, you've got to turn it over." Id. at 1320. In view of this evidence, the Second Circuit held that the government "tacitly suggested and condoned further searching" of defendant's private documents. Id. at 1319-20. Likewise, in this case, the F.B.I. agent's e-mail to Unknownuser contained an unambiguous solicitation "to bring other information forward." The context of the message clearly reveals that this solicitation was made apart from the request to send "additional images . . . from [Steiger's] computer."[9] Furthermore, in view of the previous assurance of immunity from arrest and prosecution, this solicitation moved the government beyond a mere "passive position toward the underlying private conduct." Skinner, 489 U.S. at 615.

The record indicates that several months after the F.B.I. agent solicited Unknownuser "to bring other information forward," Unknownuser sent an e-mail on December 3, 2001, indicating that he "found another child molester" and that he had "collected all the evidence." A police officer responded that "the FBI has asked that you send whatever information you have regarding this criminal complaint to my e-mail address." Consistent with the earlier solicitation, Unknownuser then sent various files that he obtained illegally from Jarrett's computer.

---

[9] Although Unknownuser protested in an e-mail message that he lacked fluency in the English language, an F.B.I. agent testified that Unknownuser "spoke English very well." Moreover, the following e-mail, as did many of his other e-mails, suggested no lack of facility with the language:

> Hello again. I know what had happened to Dr. Steiger. I made another criminal complaint about a child molester in Richmond, VA. I asked Major Kevin J. Murphy in Montgomery PD to help me. He said "send me all the files. I'll send them to FBI and they will contact you." It's been 10 day and nobody called me. Are you retired or still in FBI? Please help me. I really want to know whats going on.

Indeed, the F.B.I.'s communications to Unknownuser and Unknownuser's responses to those communications belie the notion that Unknownuser lacked fluency in the English language.

After the F.B.I. received these files by e-mail, an F.B.I. agent continued to correspond with Unknownuser and sent an e-mail that included the following:

> But if you should happen across such pictures as the ones you have sent to us and wish us to look into the matter, please feel free to send them to us. We may have lots of questions and have to e-mail you with the questions. But as long as you are not "hacking" at our request, we can take the pictures and identify the men and take them to court. We also have no desire to charge you with hacking. You are not a U.S. citizen and are not bound by our laws.

This further solicitation evidenced again the unambiguous message the F.B.I. earlier sent to Unknownuser: continue your criminal conduct and send the fruits of your efforts to us for prosecution.

In summary, the record suggests that Unknownuser was not acting at the urging of the F.B.I. when he first searched Steiger's computer and forwarded files from that computer to the F.B.I. The record reveals, however, that after that initial contact, the F.B.I. developed a relationship with Unknownuser that was intended to exploit Unknownuser's capabilities. Indeed, the F.B.I. agents actively encouraged Unknownuser to continue his activities in the following manner: (1) requesting his assistance in accessing Steiger's computer after they seized it, (2) informing him that they would neither arrest nor prosecute him for his criminal activities, (3) thanking him and praising him for his hunt for abusers, (4) assuring him that his information was valuable to them in finding and prosecuting law violators, (5) seeking his continued contact with the F.B.I., and (6) requesting him to "bring forward other information" that he accessed by hacking into computers. In so doing, "[t]he government . . . knowingly acquiesce[d] in and encourage[d] directly or indirectly a private citizen to engage in activity which [the government] is prohibited from pursuing . . . ." Walther v. United States, 652 F.2d 788, 793 (9th Cir. 1981).

I would hold that the F.B.I. agent's assurances of immunity and solicitation for "other information" from the computer hacker were more than sufficient to prove the government had

encouraged, solicited, and acquiesced in Unknownuser's activities, which were designed to assist law enforcement efforts.  Those assurances of immunity and solicitations for information were extended before Unknownuser sent the e-mails and files to the F.B.I. containing information from Jarrett's computer, and they prove the F.B.I. was aware of Unknownuser's activities, acquiesced in those activities, and encouraged him to send to the F.B.I. the fruits of his activity. For these reasons, I would hold that the trial judge erred in denying the motion to suppress evidence, and I would reverse the convictions and remand for a new trial.