UNPUBLISHED

COURT OF APPEALS OF VIRGINIA

Present: Judges Beales, Russell and AtLee
Argued by teleconference


COMMONWEALTH OF VIRGINIA

MEMORANDUM OPINION* BY
v.     Record No. 1340-18-2     JUDGE WESLEY G. RUSSELL, JR.
JANUARY 22, 2019

BRANDON BRIGGS


FROM THE CIRCUIT COURT OF BRUNSWICK COUNTY
W. Edward Tomko, Judge

Rosemary V. Bourne, Senior Assistant Attorney General (Mark R. Herring, Attorney General, on brief), for appellant.

R. Clinton Clary, Jr. (Slayton & Clary, on brief), for appellee.


Pursuant to Code § 19.2-398(A)(2), the Commonwealth appeals the circuit court's pretrial order granting Brandon Briggs' motion to suppress an incriminating statement he made to a private prison investigator while Briggs was incarcerated at the Lawrenceville Correctional Center. The circuit court accepted Briggs' argument that he should have received Miranda[1] warnings prior to being questioned. For the reasons that follow, we affirm the judgment of the circuit court.

BACKGROUND

When reviewing a circuit court's decision to grant a motion to suppress evidence, we view the facts in the light most favorable to the prevailing party below, in this case Briggs, and grant him all reasonable inferences fairly deducible therefrom. Commonwealth v. Grimstead, 12 Va. App. 1066, 1067 (1991). So viewed, the evidence established that, at the time of the alleged offense,

---

* Pursuant to Code § 17.1-413, this opinion is not designated for publication.

[1] Miranda v. Arizona, 384 U.S. 436 (1966).

Briggs was incarcerated at the Lawrenceville Correctional Center ("Lawrenceville"). Lawrenceville is owned and run by a private prison company. According to Elmus Morgan, an employee of Lawrenceville who was called by the Commonwealth as a witness, Lawrenceville is operated pursuant to a contract with the Virginia Department of Corrections and houses inmates for the Department of Corrections. In response to questioning by the Commonwealth, Morgan testified that, while at Lawrenceville, staff employed by the private company operate in the same manner as the staff at prison facilities run by the Department of Corrections.

Captain Michelle Grady is employed as a watch commander at Lawrenceville.[2] She testified that she and Briggs were familiar with one another from her work at the prison and that they had a good rapport.

In September 2016, Grady received information that Briggs had drugs in his cell. In response to the tip, she decided to search Briggs' cell. While Briggs was in the recreational yard, Grady and other correctional personnel assembled the K-9 unit and searched the cell, which Briggs shared with another inmate. The drug dog alerted to Briggs' mattress and, after a hand search of a tear in the mattress, seventy-two strips of Suboxone were found hidden inside Briggs' mattress.

According to Grady, facility policy required that, because contraband had been found in his cell, Briggs be transferred to "restricted housing" or "segregation." On multiple occasions in the proceedings below, the Commonwealth characterized this restricted housing area as "the hole."

To effectuate Briggs' transfer to segregation, Grady radioed two other certified correctional officers at the facility to apprehend Briggs while he was in the recreation yard. Those officers detained Briggs, handcuffed him, and escorted him to Lawrenceville's medical unit. While still

_____

[2] At the time of the incident with Briggs, Grady was a watch commander and a lieutenant. She received her promotion to captain after the incident but before she testified at the hearing on Briggs' motion to suppress.

handcuffed, Briggs was subjected to a brief medical examination. When the examination revealed no existing injuries or other issues, Briggs was taken to a "holding cell."[3]

According to Grady, Briggs was under the same basic restrictions in the holding cell as he eventually would face when he arrived in restrictive housing. She testified that, once in the holding cell, Briggs "was already under prehearing detention" and had been "removed from general population[.]" Thus, he was no longer "able to move around freely like he does" when in general population.

Unlike the two-person cell in which Briggs normally was housed, the holding cell was designed for one occupant, and Briggs was the sole occupant during the relevant time period. Briggs was placed in the holding cell instead of being taken directly to restrictive housing because of the need for the facility to conduct a "count." At the same time as the medical evaluation of Briggs was completed, both a recreational period and an education period ended, meaning inmates were returning to their cells from both the recreation yard and classes. According to Gregory Kellett, an investigator employed by Lawrenceville, Briggs had to remain in the holding cell while the other inmates were returning to their cells because Briggs was to be escorted to segregation in handcuffs and "moving an inmate in handcuffs is not a good idea with inmates that are not in handcuffs, so we hold them in a cell until the yard clears . . . ."

In his role as an investigator at Lawrenceville, Kellett was charged with investigating potential institutional infractions and was called on to interview inmates. Kellett testified that he "interviewed inmates in multiple instances" and that "possible criminal charges would be one of"

_____

[3] The handcuffs were removed after Briggs was placed in the holding cell.

those instances. Once a decision is made to "criminally charge somebody," Kellett indicated that he would "pass [the case] on to Morgan."[4]

Kellett was familiar with Briggs prior to the September 2016 incident. Kellett previously had served as a unit manager for the unit to which Briggs had been assigned. He said that he talked to Briggs "on a regular basis" and that they had a good rapport.

Kellett was in his office on the day in question when he received a telephone call informing him of the search of Briggs' cell. He was told that contraband that was suspected to be drugs had been recovered from Briggs' mattress and that Briggs had been taken to the medical unit for a screening examination before he could be transferred to restrictive housing.

Consistent with his duties as a facility investigator, Kellett went to the medical unit to interview Briggs. On his way there, he encountered Grady. When the two of them arrived at the medical unit holding cell, Kellett informed the medical unit guard that he needed to speak with Briggs.

Once the door to the holding cell was opened, Kellett entered the cell with Grady behind him. Although the door to the cell remained open during Kellett's brief interview of Briggs, Grady was positioned in the doorway during the interview. Kellett then informed Briggs that contraband had been found in Briggs' cell and asked Briggs if it was his.[5] Briggs immediately responded that the contraband was his. At no time during the interview was Briggs informed of his rights pursuant to Miranda or that he was free to leave and return to his regular cell. In fact,

---

[4] Morgan serves as the lead criminal investigator at Lawrenceville, and Kellett reports possible criminal infractions to Morgan. Although Morgan is employed by the private company that runs the facility, the indictment indicates he was the grand jury witness whose testimony led to the issuance of the indictments against Briggs in this case.

[5] At the time of the interview, the contraband had not been tested. Thus, although it was believed to be drugs, the fact that the contraband was Suboxone had not yet been confirmed.

Briggs was not free to return to his regular cell because, as the Commonwealth notes on brief, "Briggs was going to segregation" regardless of the outcome of his interview with Kellett.

The interview ended with Briggs' admission that the contraband was his. Once the facility's "count" was completed, Briggs was transferred from the holding cell to segregation.

Briggs subsequently was indicted for two offenses related to his alleged possession of the Suboxone: possession of a controlled substance by a prisoner in violation of Code § 53.1-203(6) and possession of a controlled substance with the intent to distribute in violation of Code § 18.2-248(E1). He filed a motion to suppress his statement to Kellett that the contraband was his, arguing that he should have been read his Miranda rights before Kellett began the interview.

The circuit court held a hearing on the motion; evidence was taken and the parties argued their respective positions, with both parties contending that the United States Supreme Court's decision in Howes v. Fields, 565 U.S. 499 (2012), dictated a favorable result. Briggs argued that, under the Howes standard, he should have been provided Miranda warnings before Kellett began the interview, and thus, the trial court had to suppress the incriminating statement he made in the interview. In response, the Commonwealth argued that, under the rationale of Howes, Kellett was not required to provide a Miranda warning prior to interviewing Briggs because Briggs was not in "custody" for purposes of Miranda when the interview occurred. Alternatively, the Commonwealth argued that the brief interview did not constitute an interrogation for Miranda purposes and that Kellett, as a facility investigator employed by a private prison company, was not a law enforcement agent who was required to give Miranda warnings.

The circuit court granted the motion, finding that, under Howes, Miranda applied to the circumstances. The court specifically found that Briggs was in "custody" for the purposes of

Miranda when he was in the holding cell awaiting his transfer to segregation, that, at the time of the interview, Briggs was "not, in any way, free to leave or go back to his normal activities as an inmate in the prison[,]" that Kellett's interview was part of "a criminal investigation" that had already uncovered "a significant amount of contraband," and that Kellett was an agent of the Commonwealth serving a law-enforcement function when he conducted the interview.

The Commonwealth appeals, asserting multiple grounds for reversal. First, the Commonwealth contends that the circuit court erred in "ruling that Briggs as an inmate was in a heightened level of custody under Miranda, and as such, faced coercion while questioned." Next, the Commonwealth argues that the circuit court erred in "ruling that Briggs was interrogated by Kellett rather than answering an inquiry from an administrative fact finder." Finally, the Commonwealth argues the circuit court erred in concluding that "Kellett was a law enforcement agent . . . when he questioned Briggs."

ANALYSIS

I. Miranda v. Arizona

In Miranda, the United States Supreme Court "adopted a set of prophylactic measures to protect a suspect's Fifth Amendment right from the 'inherently compelling pressures' of custodial interrogation." Maryland v. Shatzer, 559 U.S. 98, 103 (2010) (quoting Miranda v. Arizona, 384 U.S. 436, 467 (1966)). Specifically, the Miranda Court directed that, in conducting custodial interrogations, officers must provide the suspect with warnings, detailing his right to remain silent and his right to the presence of an attorney. Miranda, 384 U.S. at 444.

The duty to give Miranda warnings only arises in the face of government action. As we have observed, the requirements of Miranda are "directed toward police conduct." J.D. v. Commonwealth, 42 Va. App. 329, 334 (2004) (quoting Mier v. Commonwealth, 12 Va. App. 827, 830 (1991)). Thus, the duty "is limited to employees of governmental agencies *whose*

*function is to enforce the law,* or to those acting for such law enforcement agencies by direction of the agencies; . . . it does not [apply to] private citizens not directed or controlled by a law enforcement agency[.]'" Id. (emphasis and ellipsis in original) (quoting Mier, 12 Va. App. at 830).

## II. Custody for the purposes of Miranda

The Commonwealth first argues that Miranda was inapplicable because Briggs was not in custody at the time of the interview. In challenging the circuit court's conclusion that Briggs was in custody for Miranda purposes, the Commonwealth raises a mixed question of law and fact. Cf. Commonwealth v. Quarles, 283 Va. 214, 219 (2012). As such, we review the "circuit court's findings of historical fact only for clear error[] and . . . give due weight to inferences drawn from those factual findings[,]" Commonwealth v. Redmond, 264 Va. 321, 327 (2002), but conduct a *de novo* review of the circuit court's determination that those facts and inferences meet the relevant "constitutional standard," id. at 326. See also Thompson v. Keohane, 516 U.S. 99, 112-13 (1995).

In determining whether a suspect is in custody for Miranda purposes, a reviewing court conducts an objective review of the totality of the circumstances surrounding the encounter. Stansbury v. California, 511 U.S. 318, 322-23 (1994) (*per curiam*). Ultimately, the question is whether "a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation[.]" Thompson, 516 U.S. at 112.

Although restrictions on movement are certainly part of the analysis, it is important to recognize that, for the purpose of Miranda, custody entails more than the restrictions on movement normally associated with that concept outside the Miranda context. "Not all restraints on freedom of movement amount to custody for purposes of Miranda." Howes, 565 U.S. at 509. Rather, in evaluating whether Miranda warnings are required, "'custody' is a term of art that

specifies circumstances that are thought generally to present a serious danger of coercion." Id. at 508-09. Whether the circumstances are coercive "is determined from the perspective of the suspect." Illinois v. Perkins, 496 U.S. 292, 296 (1990).

In making the Miranda custody determination, courts consider "the location of the questioning, its duration, statements made during the interview, the presence or absence of physical restraints during the questioning, and the release of the interviewee at the end of the questioning." Howes, 565 U.S. at 509 (citations omitted). Other pertinent factors include whether the inquiring officers were armed, whether the door to the interview location remained opened, and whether the person being interviewed was informed he was free to leave.

Although all of these factors remain relevant, their relative importance changes when the subject of the questioning is serving an active prison sentence at the time of the questioning. Although being incarcerated certainly establishes a sufficient restriction on movement to raise Miranda concerns, Shatzer, 559 U.S. at 112, "standard conditions of confinement and associated restrictions on freedom will not necessarily implicate the same interests that the Court sought to protect when it afforded special safeguards to persons subjected to custodial interrogation. Thus, service of a term of imprisonment, without more, is not enough to constitute Miranda custody." Howes, 565 U.S. at 512.

Although the Howes Court rejected a categorical rule that Miranda always applies to the questioning of inmates, it similarly rejected the notion that Miranda never applies in such situations. It noted that, in determining whether Miranda applies, "[t]he answer . . . would depen[d] upon whether [incarceration] exerts the coercive pressure that Miranda was designed to guard against—the danger of coercion [that] results from the *interaction* of custody and official interrogation." Id. at 506 (alterations in original) (internal quotation marks and citation omitted). In further explaining the required analysis, the Howes Court held that

> [w]hen a prisoner is questioned, the determination of custody should focus on all of the features of the interrogation. These include the language that is used in summoning the prisoner to the interview and the manner in which the interrogation is conducted. An inmate who is removed from the general prison population for questioning and is thereafter . . . subjected to treatment in connection with the interrogation that renders him "in custody" for practical purposes . . . will be entitled to the full panoply of protections prescribed by <u>Miranda</u>.

<u>Id.</u> at 514 (ellipses in original) (internal quotation marks and citations omitted).

Despite disagreeing about the ultimate result, the parties argued in the circuit court and continue to argue on appeal that <u>Howes</u> provides the rule of the decision. In issuing its ruling below, the circuit court relied heavily on its interpretation of <u>Howes</u>. Despite some significant factual differences between it and the instant case, we also find that <u>Howes</u> controls the outcome here.

In <u>Howes</u>, Fields was serving a sentence when sheriff's deputies questioned him about a sexual offense against a child that Fields was believed to have committed prior to being incarcerated. <u>Id.</u> at 502. A corrections officer escorted Fields to a conference room where the interview was to take place. To reach the conference room, "Fields had to go down one floor and pass through a locked door that separated two sections of the facility." <u>Id.</u> Once Fields was in the conference room, the sheriff's deputies questioned him for seven hours. <u>Id.</u> at 503.

At no time during the encounter was Fields informed of his <u>Miranda</u> rights or otherwise informed that he did not have to participate in the interview. <u>Id.</u> at 504. When the interview began, however, "Fields was told that he was free to leave and return to his cell." <u>Id.</u> at 503. Later in the interview, Fields was again informed that he was free to leave and return to his regular cell. <u>Id.</u> Although the deputies who conducted the interview were armed, Fields was not handcuffed or otherwise restrained during the interview in the conference room. <u>Id.</u> Over the

course of the seven-hour interview, "[t]he door to the conference room was sometimes open and sometimes shut." Id.

Fields eventually confessed to the crime being investigated. Id. After the interview concluded and Fields was "ready to leave, he had to wait an additional 20 minutes or so because a corrections officer had to be summoned to escort him back to his cell[.]" Id. at 503-04.

In conducting its analysis of whether Fields was in custody for the purpose of Miranda, the United States Supreme Court noted that certain facts supported an argument that he was. It noted that, Fields "did not invite the interview or consent to it in advance, and he was not advised that he was free to decline to speak with the deputies." Id. at 515. It also noted that the length of the interview, the fact that the deputies were armed, and the fact that one of the interviewers "'[u]sed a very sharp tone', . . . and, on one occasion, profanity," all augured in favor of a finding of Miranda custody. Id. (internal citation omitted).

Ultimately though, a majority of the Howes Court found that "[t]hese circumstances . . . were offset by others" that supported the conclusion that Fields was not in custody for the purpose of Miranda. Id. Specifically, Fields "was not physically restrained or threatened and was interviewed in a well-lit, average-sized conference room, where he was 'not uncomfortable.'" Id. "He was offered food and water, and the door to the conference room was sometimes left open." Id. "Most important, [Fields] was told at the outset of the interrogation, and was reminded again thereafter, that he could leave and go back to his cell whenever he wanted." Id. From these "objective facts," the Howes majority concluded that "a reasonable person would have felt free to terminate the interview and leave." Id. (internal quotation marks and citation omitted).

Like Howes, this case has factual elements that lend support to either result. As the Commonwealth notes, the interview was brief and non-threatening, lasting for only one question

and response. It occurred with the cell door open, albeit one with a prison official standing in it, and was conducted by unarmed personnel with whom Briggs was familiar and with whom he had a good rapport. All of these facts support a finding that Briggs was not in Miranda custody.

Despite reaching a different ultimate conclusion, we, like the Howes Court, find "[t]hese circumstances . . . were offset by others." Id. Unlike in Howes, one of the persons conducting the interview of Briggs ordered him seized based on an investigation she was conducting. Inconsistent with his usual routine within the prison, guards seized Briggs from the recreation yard, placed him in restraints, and took him not to his regular cell, but to the medical unit for processing.[6] The sole purpose of the medical unit processing was to clear Briggs for transfer to restricted housing, which the Commonwealth characterized in the trial court as "the hole."[7] The interview was not conducted in a "well-lit, average-sized conference room," id., but in a prison cell. Unlike Briggs' regular cell, the cell was designed for only one inmate and, according to Grady, presented the same basic conditions that Briggs would face in segregation, which, again, the *Commonwealth* characterized as "the hole" in the proceedings below.

---

[6] The Commonwealth argues that the fact that Briggs was transported to and from the medical unit in handcuffs is immaterial because the Howes majority noted that, for already incarcerated suspects, "[e]scorts and special security precautions may be standard procedures regardless of the purpose for which an inmate is removed from his regular routine and taken to a special location." 565 U.S. at 513. The record in this case, however, establishes that Briggs was only placed in handcuffs while moving about the prison because of the investigation as Kellett testified that Briggs had to be held until the count had been completed because it would not be safe to transport Briggs in handcuffs when all of the other prisoners who were returning from the recreation yard or classes would not be. Thus, it was the investigation that required the additional restrictions on Briggs' freedom, not his mere status as an inmate.

[7] We recognize that counsel's statement in the proceedings below is not evidence. However, given the solitary nature of restricted housing and the fact that the question before us is whether an objective person in Briggs' position would feel coercion, that the Commonwealth felt free to characterize Briggs' destination as "the hole" seems significant when the record is viewed in the light most favorable to Briggs.

- 11 -

Not only was Briggs not told that he was free to terminate the interview and return to his cell, he was not, in fact, free to do so. As the Commonwealth acknowledges on brief in this Court, "Briggs was going to segregation" regardless of the outcome of his interview with Kellett. As such, he was not going to be "released back into the general prison population" or "return to [his] accustomed surroundings and daily routine[.]" Shatzer, 559 U.S. at 113. Thus, he was not going to "regain the degree of control [he] had over [his] li[fe] prior to the interrogation." Id.

Because the record establishes that Briggs was subjected to substantial restraints on his liberty *in addition* to those he experienced every day as an inmate and that the totality of the circumstances reasonably suggested a coercive environment, we conclude that Briggs was in custody for the purposes of Miranda when Kellett questioned him regarding ownership of the contraband.[8]

### III.  Administrative inquiry versus criminal interrogation

The Commonwealth next argues that Miranda did not apply because Kellett was not conducting an interrogation as part of a criminal investigation when he questioned Briggs. The Commonwealth asserts that he was only making "administrative inquiries" about "institutional infractions," and thus, the circuit court erred in concluding that he interrogated Briggs in furtherance of a criminal investigation.

---

[8] The Commonwealth argues that there is no evidence that Briggs was told that he was being taken to segregation, and therefore, that could not have had a coercive effect on him. We reject this argument. Viewing the record in the light most favorable to Briggs, Grimstead, 12 Va. App. at 1067, we conclude that, given his familiarity with the normal day-to-day at the prison, a reasonable inference can be drawn that Briggs would have known the significance of being seized in the recreation yard, handcuffed, and taken for the medical screening examination that was required before a prisoner is transferred to segregation. Assuming such an inference were unwarranted, the Commonwealth fares no better. If Briggs were wholly unaware of why he had been seized, handcuffed, and transferred to a solitary holding cell in the medical unit, we are left with a prisoner being subjected to radically different treatment than the norm for no apparent reason, adding additional elements of intimidation and coercion to his encounter with Kellett and Grady.

This argument presents a mixed question of law and fact. Accordingly, we again review the "circuit court's findings of historical fact only for clear error[] and . . . give due weight to inferences drawn from those factual findings," Redmond, 264 Va. at 327, but conduct a *de novo* review of the circuit court's determination that those facts and inferences are sufficient to meet the "constitutional standard" for an interrogation, id. at 326.

Although we acknowledge that the facility has a legitimate interest in making sure its institutional rules are followed, the trial court correctly concluded from the evidence that Kellett's questioning of Briggs was part of "a criminal investigation." Prior to Kellett's involvement, prison officials had received a tip that Briggs had drugs in his cell. In response, they arranged to search the cell with a drug dog and discovered what they believed (and ultimately proved) to be drugs that Briggs could not possess legally. The quantity of drugs discovered suggested that Brigg possessed them with the intent to distribute. As a result of the discovery of the drugs, prison officials had Briggs seized and removed from the recreation yard in handcuffs in what reasonably could have been perceived by Briggs as the functional equivalent of an arrest. They then initiated the process by which Briggs would be and ultimately was transferred to segregation.

After all of this, Kellett is involved and made aware of the history. Although there is evidence that, in general, his primary concern is institutional infractions, Kellett himself testified that he "interviewed inmates in multiple instances" and that "possible criminal charges would be one of" those instances. Viewing this testimony in the light most favorable to Briggs, Grimstead, 12 Va. App. at 1067, it is clear that Kellett conducted investigations involving potential criminal charges in addition to investigating institutional infractions.

Furthermore, the nature of the suspected offense and the question Kellett asked support the conclusion that this was an interrogation. Everyone understood that Briggs' possession of

drugs was not simply an institutional infraction; it constituted a crime. Given his knowledge of the tip that initiated the investigation and the fact that the drugs had been discovered in Briggs' mattress, Kellett's question regarding ownership of the contraband was likely to elicit an incriminating response. Cf. Rhode Island v. Innis, 446 U.S. 291, 301 (1980) (holding that activities designed to elicit incriminating responses are the functional equivalent of interrogation). Accordingly, the totality of the circumstances amply supports the conclusion that Kellett's question constituted interrogation for the purpose of Miranda.

## IV. Kellett as a law-enforcement agent

As noted above, Miranda warnings are required only if the interrogation is conducted by law enforcement agents or by "those acting for . . . law enforcement agencies . . . ; it does not [apply to] private citizens [who are] not directed or controlled by a law enforcement agency[.]" J.D., 42 Va. App. at 334 (quoting Mier, 12 Va. App. at 830). The Commonwealth argues that Kellett, as an employee of a private prison company, was a mere private citizen with no duty to provide Briggs with Miranda warnings, and therefore, the circuit court erred in concluding that Kellett was an agent of the Commonwealth who was required to inform Briggs of his Miranda rights.

As the Commonwealth acknowledges, whether Kellett was serving as an agent of law enforcement at the time he interrogated Briggs is a question of fact. Jarrett v. Commonwealth, 42 Va. App. 702, 712 (2004). Accordingly, we owe deference to the conclusion of the circuit court and may reverse its conclusion only if it is plainly wrong or without evidence to support it. Secret v. Commonwealth, ___ Va. ___, ___ (Oct. 11, 2018).

- 14 -

The Commonwealth cites statutes defining "law enforcement officer," which, unsurprisingly, limit the definition to government employees.[9] Extrapolating from this, the Commonwealth argues that Kellett was no different from the private security guards employed by a department store in Mier who we concluded were not government agents, and therefore, were not required to provide Miranda warnings. 12 Va. App. at 833.

Although the Commonwealth accurately cites the statutes and correctly summarizes our holding in Mier, its argument misses the forest for the trees by ignoring the function served by Kellett and his colleagues at Lawrenceville. Unlike the security guards in Mier whose "duty was to serve [the department store] and to protect its interests," Kellett and the others at the prison "had [a] duty . . . with respect to the general enforcement of public order." Id. That the duty arose from a contract as opposed to a statute is, in this case, immaterial.

The undisputed evidence established that Lawrenceville was operated pursuant to a contract with the Virginia Department of Corrections to house inmates who had been sentenced to the Virginia Department of Corrections and that the staff at Lawrenceville operated in the same manner as the staff at prisons run by employees of the Department of Corrections. Housing convicted felons who are serving sentences imposed by the courts of the Commonwealth is, at its core, a governmental, as opposed to a private, function. Furthermore, the running of a prison holding such inmates is certainly a law enforcement activity by any reasonable definition. That the Commonwealth, for administrative, economic, or other reasons, chose to perform this core governmental function through the use of private contractors as

---

[9] Even assuming that the cited statutes set the outer limit of who may claim the formal title of "law enforcement officer," they are not dispositive here because, as noted above, Kellett was required to provide Miranda warnings if he were simply a "private citizen[] . . . directed or controlled by a law enforcement agency[.]" Mier, 12 Va. App. at 830.

opposed to using direct employees did not alter the fundamental character of the activity.[10]

Accordingly, analogies to department store security guards protecting private interests fail in the context of this record.

In short, there is evidence in the record to support the conclusion that Kellett was acting as an agent of law enforcement when he interrogated Briggs. Accordingly, the circuit court did not err in drawing that conclusion.

CONCLUSION

For the foregoing reasons, we conclude that the circuit court did not err in granting Briggs' motion to suppress his statement to Kellett. Accordingly, we affirm the judgment of the circuit court and remand the matter to the circuit court for further proceedings if the Commonwealth be so advised.

<u>Affirmed and remanded.</u>

---

[10] A simple analogy demonstrates the fatal flaw in the Commonwealth's argument. Like running a prison, providing a police force is a core government function involving law enforcement. If the Commonwealth were correct, the Commonwealth could by and large avoid many of the restrictions on government action found in the Bill of Rights by disbanding governmental police forces and engaging private contractors to perform the same function.